Raphael Janove (Cal. Bar No. 361193)
raphael@janove.law
JANOVE PLLC
115 Broadway, 5th Fl.
New York, NY 10006
Telephone: (646) 347-3940

Liana Vitale (Cal. Bar No. 348772)
liana@janove.law
JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

Elizabeth Aniskevich (*pro hac vice* forthcoming)
eaniskevich@singletonschreiber.com
Jennifer Yadoo (*pro hac vice* forthcoming)
jyadoo@singletonschreiber.com
Ryan Crosswell (*pro hac vice* forthcoming)
rcrosswell@singletonschreiber.com
SINGLETON SCHREIBER, LLP
650 Massachusetts Ave. NW, Suite 600
Washington, DC 20001
Telephone: (619) 771-3473

Anna Haac (*pro hac vice* forthcoming)
anna@haaclaw.com
HAAC LAW, LLC
11810 Grand Park Ave., Suite 500
North Bethesda, MD 20852
Telephone: (240) 389-0199

*Attorneys for Plaintiff and Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASSAN WRIGHT, individually and on behalf of all others similarly situated,<br><br>    *Plaintiff*,<br><br>v.<br><br>UBER TECHNOLOGIES, INC. d/b/a Uber Eats,<br><br>    *Defendant*. | Case No. 3:26-cv-7753<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Case No. 3:26-cv-7753          **CLASS ACTION COMPLAINT**

Plaintiff Hassan Wright, individually, and on behalf of all others similarly situated, brings this class action suit for damages and equitable relief against Uber Technologies, Inc. d/b/a Uber Eats ("Uber" or "Defendant"). Plaintiff Wright alleges the following based upon personal information as to allegations regarding himself, and based upon his own investigation, the investigation of his counsel, or on information and belief as to all other allegations:

## NATURE OF THE ACTION

1. For years, Uber Eats has swindled its customers through its "priority fee" option, which falsely promises that customers can pay extra to have food orders delivered "direct[ly]" to them. In reality, Uber Eats drivers are permitted – even encouraged – by Uber to make other stops along the way. Uber Eats has reaped staggering profits from these misleading and unlawful priority fees — likely totaling in the hundreds of millions of dollars nationwide. This lawsuit is filed against Uber on behalf of customers who lost money due to Uber's deceptive practices.

2. Uber Eats is an online food ordering and delivery platform launched by Uber in 2014. Through the Uber Eats mobile phone application and website, customers can browse nearby restaurants and arrange to have food delivered by Uber's designated couriers.

3. On the checkout screen for each Uber Eats order, Uber provides customers with the opportunity to pay a "priority" fee, which is typically priced between $1-5.



4. As can be seen in the image above, the "priority fee" button contains the representation "direct to you" in contrasting green color.

5. The Uber Eats "direct to you" priority fee language is misleading because it causes consumers to reasonably believe that by paying extra for priority delivery, Uber will ensure that their food will arrive directly from the restaurant to their address or "direct to you," as expressly promised on the check-out screen.

6. However, this is not the case. Uber allows drivers delivering priority orders to make other stops first. In fact, Uber does not even notify drivers that a consumer has paid a priority fee in exchange for direct delivery.

7. Further, Uber's own practices and contractual arrangements with its couriers render Uber Eats' "direct to you" surcharge a sham.

8. For example, according to Uber's own courier agreement, couriers are entirely free to "multi-app," meaning that they may simultaneously deliver for other application platforms, such as Doordash and GrubHub, at the same time they are delivering for Uber Eats. Industry surveys confirm that a substantial percentage of Uber Eats drivers do, in fact, multi-app.

9. Because Uber Eats does not notify its drivers when an order is priority, Uber Eats couriers who multi-app have no way of knowing that customers have paid for and are expecting priority service. As a result, these drivers may decide to pick up and/or deliver orders from other platforms before completing an Uber Eats priority delivery directly to them. In fact, Uber explicitly authorized its drivers to do this, even as Uber falsely promises its customers they can guarantee "direct" delivery for an extra fee.

10. Uber Eats does not disclose to its "priority" customers that although they are paying a priority fee for direct delivery, Uber Eats couriers may be simultaneously delivering orders for other platforms while also fulfilling Uber Eats priority orders. Uber Eats also does not disclose that this practice allows other orders to be picked up or delivered before a priority customer's food is delivered, despite Uber Eats' "direct to you" representation.

11. In addition, Uber Eats' *own platform* is designed to encourage couriers to execute a delivery route that is not "direct to" the priority customer if Uber has other orders it wishes the driver to pick up along the way. For example, in "batched" order deliveries (*i.e.* when several orders are picked up and delivered to multiple different customers), the Uber Eats platform may direct the courier to pick up additional Uber Eats orders after collecting a priority customer's order but before delivering it. There is nothing "direct" about such deliveries.

12. Uber does not disclose these batched routes to priority customers, despite the "direct to you" representation.

Case No. 3:26-cv-7753

2

**CLASS ACTION COMPLAINT**

13. These undisclosed practices and limitations are fundamentally at odds with the "direct to you" promise displayed on Uber's checkout page. The priority fee is thus not a premium for a specialized service. It is a sham surcharge for a guarantee that Uber has no means of keeping and may actively work to undermine. Uber's actions are particularly egregious in a time of significant inflation, when every dollar matters for consumers. As Americans across the country are tightening their budgets to keep up, Uber is nickel-and-diming them to fill its own coffers.

14. Because of Uber's material misrepresentations and omissions regarding the priority fee, Plaintiff Wright brings claims on behalf of himself and all those similarly situated for violations of the Unfair Competition Law, Cal. Bus. & Prof. Code, §§ 17200, et seq. ("UCL"); The False Advertising Law, Cal. Bus. & Prof. Code, §§ 17500, et seq. ("FAL"); the California Consumers Legal Remedies Act, Cal. Civ. Code, §§ 1750 et seq. ("CLRA"); and for fraud.

## PARTIES

### I.    Plaintiff

15. Plaintiff Hassan Wright is a natural person and a California resident. On at least sixteen occasions within the past year, he paid an Uber Eats priority fee. On November 8, 2025, Plaintiff Wright, in reliance on Uber's "direct to you" representation, paid an additional $1.49 for priority delivery, but this order was not delivered directly to him because the Uber Eats courier made other stops before delivering his food. When he complained to Uber about these deceptive practices, Uber did not deny that its marketing was misleading but still refused to address his concerns or correct it.

16. As a result of Defendant's conduct, Plaintiff Wright will be unable to rely on Uber's "direct to you" representation and so will not purchase priority delivery, although he would like to be able to order food for delivery directly to him in the future if he could rely on the representation.

### II.    Defendant

17. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business at 1515 3rd Street, San Francisco, California, 94158.

18. Uber Eats is a brand/product line that operates as a division within Uber Technologies, Inc. It is wholly owned by and fully integrated into Uber Technologies, Inc.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendant. The number of members of the proposed class is in the aggregate greater than 100.

20.     This Court has personal jurisdiction over Defendant because it is headquartered in San Francisco, California and, upon information and belief, key figures in its corporate executive team are located in San Francisco, including its Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer and Senior Vice President of Communications & Public Policy, Chief Legal Officer and Corporate Secretary, Head of Delivery, Chief Product Officer, and Chief Technology Officer. Defendant conducts business in California, and a substantial portion of the acts complained of took place in San Francisco, California.

21.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Uber resides in this district, and the conduct complained of herein occurred within this district.

22.     The deceptive practices alleged herein were conceived, reviewed, approved, implemented and otherwise controlled from Defendant's headquarters in San Francisco, California. Furthermore, the misrepresentations and omissions alleged herein were contained on Defendant's website and mobile phone application, which are maintained in California.

**DIVISIONAL ASSIGNMENT**

23.     Assignment to the San Francisco or the Oakland Division is proper under Civil Local Rules 3-2(c) and 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Francisco County.

**FACTUAL ALLEGATIONS**

I.      **Uber Eats Misleads Priority Customers Into Believing That When They Pay for Priority Delivery, Their Order Will Be Taken Directly From the Restaurant to Their Address.**

24.     On both the Uber Eats mobile app and the Uber Eats website, customers are provided with the option to pay a "priority" fee at checkout. The fee typically ranges between $1-$5.

25.     As described above, the "priority" button on the checkout page contains the language "direct to you" next to the priority fee surcharge amount.

26.     The "direct to you" language customers see each time they check out leads them to understand and expect that, when they pay extra for priority delivery, their food will arrive "direct[ly] to [them]" from the restaurant.

27.     Merriam-Webster defines "direct" as "from point to point without deviation" and "from the source without interruption or diversion," confirming that "direct to you" means without any intervening stops. *Direct*, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct (last visited July 21, 2026).

28.     Consumers who pay for "direct" delivery do so precisely because they want their food to arrive directly to them, without intervening stops. The reasons for this may be many, including because they are hungry and want the food to arrive as directly as possible, preserving hotness or freshness, or to avoid a mix-up with another customer's order. Uber Eats understands the value these consumers assign to direct delivery and uses the language "direct to you" to lure them into paying for a guarantee that Uber cannot make.

29.     Nothing else on Uber's platform corrects or contradicts consumers' reasonable understanding of "direct to you." When a customer clicks on the ⓘ (information) symbol next to the "priority fee" in the "order total" section, the below popup window appears, which does nothing to correct the misimpression that the priority fee guarantees "direct to you" delivery, without any stops or detours along the way.

### What's a Priority Fee?

This fee helps cover the cost of prioritizing your order. The amount may vary based on things like your location and items in your cart.

**Close**

## II.     Priority Orders Are Not Delivered "Direct" to Consumers.

30.     Uber misleads consumers about the way the "priority" fee deliveries actually operate

and, as a result, has skimmed hundreds of millions of dollars in priority fees from customers' pockets. Uber Eats does this in several ways.

31. First, Uber Eats *does not even inform* its couriers when a customer has paid a priority fee. This leaves the Uber Eats driver without the necessary knowledge to prioritize the delivery, let alone deliver it "direct[ly] to" the customer.[1] Uber Eats fails to disclose to consumers that its couriers are not notified of priority orders.

32. Uber's failure to notify Uber Eats couriers when a customer has paid a priority fee is particularly problematic given that, according to recent industry surveys, almost 70% of gig work drivers "multi-app," meaning that they deliver for multiple platforms at once.[2] In fact, according to a 2025 study by Gridwise, a company that produces analytics regarding the gig economy, approximately 38% of Uber Eats drivers multi-app with GrubHub alone.[3]

33. Uber is aware of this. Indeed, the Uber Eats courier agreement explicitly allows multi-apping. Specifically, the agreement states that couriers "are entirely free to choose whether to contract with other companies to provide delivery services, including competitors of Uber Eats; this includes doing so at the same time as when you are using the Provider App (known as 'multiapping')."[4] Multi-apping can result in the courier making several stops prior to delivering an

[1] https://www.ridesharingdriver.com/uber-eats-priority-delivery/ ("Uber Eats drivers are not notified when you pay for priority delivery. They don't know that you paid for priority! There is no special note or alert informing them that you paid for priority."); https://www.reddit.com/r/UberEatsDrivers/comments/1pfreqo/priority/ ("The driver … has no idea which order is assigned 'priority'"); https://www.reddit.com/r/UberEATS/comments/1brsl92/can_someone_explain_what_paying_for_priority/ ("Uber doesn't tell the driver if any order is supposed to be priority or not."); https://www.youtube.com/watch?v=cDofJlhJVp0 (Uber driver video testimonial explaining that couriers are not informed when customers have paid a priority fee).

2 Katherine Tangalakis-Lippert, For gig workers, cash flow is king — and instant pay delivers, BUS. INSIDER (June 27, 2025), https://www.businessinsider.com/gig-drivers-rely-on-instant-pay-forfinancial-stability-survey-2025-6

[3] Ryan Green, How Gig Workers Multi-App to Maximize Their Earnings, LinkedIn (Sept. 2025), https://www.linkedin.com/pulse/how-gig-workers-multi-app-maximize-earnings-ryan-green-s3qkf/

[4] Uber Technologies, Inc., *Part 1 Uber Technology Services Agreement (Delivery Partners)*, https://help.uber.com/driving-and-delivering/article/part-1--uber-technology-services-agreement-deliverypartners?nodeId=6133a9a8-d427-4a50-be8b-8e67680e88c3 (last visited Mar. 18, 2026); Uber Technologies, Inc., *Part 2 Uber Technology Services Agreement (Fleet Partner Couriers)*,

Uber Eats priority order.

34.    Because couriers who multi-app do not know when an Uber Eats customer has paid a priority fee and is expecting a "direct" delivery, a multi-app driver's route might be as follows:

- **Pick up Order A (Uber Eats priority)** – Restaurant 1
- Pick up Order B (Doordash) – Restaurant 2
- Pick up Order C (Postmates) – Restaurant 3
- **Deliver Order A**
- Deliver Order B
- Deliver Order C

35.    In fact, because Uber does not control the sequence of deliveries for other platforms, the ultimate route the driver takes may look like this:

- **Pick up Order A (Uber Eats priority)** – Restaurant 1
- Pick up order B (Doordash) – Restaurant 2
- Pick up order C (GrubHub) – Restaurant 3
- Deliver order B
- Deliver order C
- **Deliver order A**

36.    Uber knows that drivers are multi-apping and making other deliveries, but it continues to charge consumers a priority fee for a false guarantee of direct delivery.

37.    Even exclusively within the Uber application, Uber may encourage drivers to make multiple stops before delivering a "priority" order. For example, Uber processes "batched" orders, where Uber Eats assigns two or more customers' orders to the same delivery driver during a single trip. In the case of a "batched" order for a courier who is *only* delivering Uber Eats deliveries (*i.e.*, is not multi-apping), the priority customer will generally have their order delivered before other customers' orders are *delivered*, but there could be numerous additional pick-ups in between.

38.    In other words, in the case of batched orders, contrary to Uber's representation, the Uber Eats app may actually prevent priority orders from being delivered "direct to [the customer]." Instead, couriers may be instructed or allowed by the Uber Eats app to *pick up* other orders after picking up the priority customer's order but before delivering it.

https://help.uber.com/driving-and-delivering/article/part-2--uber-technology-services-agreement-fleetpartner-couriers?nodeId=b96a5064-774c-413e-bad5-c5488d3297de (last visited Mar. 18, 2026).

39.    For instance, a courier's route for a batched delivery may appear as follows:

- **Pick up order A (priority) – restaurant 1**
- Pick up order B (standard) – restaurant 2
- **Deliver order A – priority customer**
- Deliver order B – standard customer

40.    Or, if the courier is picking up three orders, for example, the route may appear as follows:

- **Pick up order A (priority) – restaurant 1**
- Pick up order B (standard) – restaurant 2
- Pick up order C (standard) – restaurant 3
- **Deliver order A – priority customer**
- Deliver order B – standard customer
- Deliver order C – standard customer

41.    The fact that other orders may be picked up before a priority customer's order is delivered is not disclosed to consumers who pay for priority "direct to you" delivery.

42.    Even if Uber informed its couriers when a customer had paid a priority fee, and even if those couriers were not multi-apping, nothing would prevent them from making additional stops before completing the priority delivery. Uber has long classified its delivery drivers as independent contractors rather than employees, and that classification has a direct consequence: Uber cannot compel its couriers to take any particular route, prevent them from making additional stops, or otherwise ensure they honor the "direct to you" promise. Uber's courier agreement specifically provides that drivers "have no obligation to follow [] navigational directions." It also provides that couriers "shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Delivery Services (including determining the delivery route)."[5] None of this is disclosed to consumers who pay for priority "direct to you" delivery.

43.    A company that cannot direct its couriers' routes cannot guarantee direct delivery. Uber knows this, yet it continues to charge consumers a premium for exactly that guarantee, without ever disclosing that it is one Uber has neither the means nor the obligation to keep.

44.    While Uber Eats affirmatively represents that paying the priority fee means an order

---

[5] Uber Technologies, Inc., Part 1 Uber Technology Services Agreement (Delivery Partners), https://help.uber.com/driving-and-delivering/article/part-1--uber-technology-services-agreement-deliverypartners?nodeId=6133a9a8-d427-4a50-be8b-8e67680e88c3 (last visited Mar. 18, 2026).

will arrive "direct to you," it never discloses that couriers are free to pick up and deliver orders from competing platforms before completing a priority delivery; that even within its own platform, couriers may be directed to pick up additional Uber Eats orders before delivering the priority order; and that its drivers "have no obligation to follow [] navigational directions" in the first place.

45. As the complaints quoted below reflect, drivers can and regularly do take indirect and circuitous delivery routes, and Uber still charges customers "priority" fees for direct delivery.

46. The fact that Uber's representations regarding the priority fee cause consumers to believe that couriers will make no additional stops before delivering their priority orders, and that Uber's actual practices frustrate this expectation, are apparent from the high volume of customer complaints related to this topic:[6]

a. *[My husband] placed an order using the Priority Service [...] My husband noticed that the driver, instead of delivering to us, proceeded to get on the freeway in the opposite direction and went into another shopping center. All the while our food was getting colder.[7]*

b. ***You're stealing from me***. *I ordered priority, and after they delivered too many others [...][8]*

c. *I paid for a priority pick up. The **driver picked my order up and then proceeded to make other deliveries** when I asked her where she was at and why were she 30 minutes away from where she was supposed to be at she told me that **I was not her only delivery and that I had to be mindful of her other orders** but again I paid for priority so my order shouldve came first [...][9]*

d. *I was not treated right by the driver. She did not bring my order priority like I ordered. **She delivered other orders before mine** it seemed from following her progress.[10]*

e. *My driver was late, so my food arrived cold. I had priority delivery, yet I noticed the driver went off in a different direction and sat in the same spot for quite some time, which led me to believe **he made another delivery before me**.[11]*

---

[6] These quotes are reproduced verbatim, except where indicated, and any spelling or grammatical errors appear in the original text.

[7] https://ubereats.pissedconsumer.com/review.html?query=priority., Complaint #6471703.

[8] *Id.*, Complaint #6832156 (emphasis added).

[9] *Id.*, Complaint #6414133 (emphasis added).

[10] *Id.*, Complaint #5886921(emphasis added).

[11] *Id.*, Complaint #5850114 (emphasis added).

Case No. 3:26-cv-7753    9    **CLASS ACTION COMPLAINT**

f.   *My driver (that was actually shown on a bicycle via application) passed my apartment multiple times, **AFTER making multiple other deliveries prior to my apartment when I paid extra for** priority delivery.[12]*

g.   *I paid for priority delivery and the driver made multiple stops. Why bother to use **priority** delivery if you are just going to do whatever you want.[13]*

h.   *I paid for priority. The application stated that Id be the first order delivered and it wasnt. Need my fee for priority delivery refunded.[14]*

i.   *I placed the order **priority** meaning my food was suppose to be pick up and delivered no stops in between and this I know because its says so when you within the completing order section yet the driver [name omitted] picked up my order at 5:40pm and I didnt receive my order til almost 7pm [...] when she picked up my order I asked was she on the way response was yes. 30mins later she was further away from my house I asked what was going on her response was she was delivering someone else order and she had no recollection of the difference between **priority** orders and regular orders [...][15]*

j.   ***I paid for priority delivery** so my order would not arrive cold. Because the order took a long turnaround time, I told the driver I hoped the order was not cold. He said he hoped that as well, **but that he was given two more orders and had to wait.**[16]*

k.   *I orderd food threw your service and paid extra for priority delivery however I was not priorised, I witnessed with my own eyes on the map the driver going out of his way to deliver someone elses order first, yes u may say thins might have been a glitch on the map but it was not ! **I confronted the driver and have video evidence of him informing me that he was told by the company to deliver to another person first, which is theft [...]**[17]*

l.   *I paid for expedited priority delivery and your driver called to say she had a first delivery and running late.[18]*

m.   *I pay for 1st priority and than watch these drivers pick my order and than sit in places **delivering other orders**.[19]*

n.   *I paid for priority delivery but the driver clearly chose to make other deliveries before*

---

[12] *Id.*, Complaint #5590999 (emphasis added).

[13] *Id.*, Complaint #5162656 (emphasis added).

[14] *Id.*, Complaint #5102195

[15] *Id.*, Complaint #4304733 (emphasis added).

[16] *Id.*, Complaint #4256117 (emphasis added).

[17] *Id.*, Complaint #3984324 (emphasis added).

[18] *Id.*, Complaint #3952093

[19] *Id.*, Complaint #3876599 (emphasis added).

*mine.* **This is disrespectful and dishonest**.[20]

o. **I paid for** priority *and I watched as she drove around town. I text her where she was going with my food and* **she replied she was making deliveries [...]**[21]

p. *Missadvertising Ordered* **priority** *delivery they stopped 3 places after picking up my order. Food cold.*[22]

q. *I had priority. Driver was late to pickup then stopped near by for 10-11 minutes the drove a little more. Stopped again for 10 minutes then delivered almost 30 later.*[23]

r. *My order was priority delivery.* **She took another order before mine** *that was opposites direction per map.*[24]

s. *This is the second time I've ordered through you as a priority order and my order was not delivered to me first even though I'm spending over $90 each time.*[25]

t. *As with any company, some drivers are better than others but* **Uber does NOT care if their drivers are late or just decide to go run DoorDash/other orders***, regardless of whether youve paid for priority delivery.*[26]

u. *Driver drove in opposite direction of delivery despite priority delivery being paid for [...] App location showed drivers location at various points.* **They were clearly making other deliveries of riders or food**.[27]

47. Thus, the "direct to you" representation is no guarantee at all, and the priority fee is nothing more than a sham surcharge that lines the pockets of Uber, while leaving consumers holding the bag.

**III. Uber Eats Customers Would Not Pay the Priority Delivery If They Knew the Truth About How It Operates.**

48. Uber intentionally misrepresents how the priority fee operates because consumers would not pay the fee if they knew the true facts about it.

49. Consumers pay the priority fee expecting a guarantee of direct delivery, not merely

---

[20] *Id.*, Complaint #3829376 (emphasis added).

[21] *Id.*, Complaint #3540298 (emphasis added).

[22] *Id.*, Complaint #3435762 (emphasis added).

[23] *Id.*, Complaint #3202084

[24] *Id.*, Complaint #3148194 (emphasis added).

[25] *Id.*, Complaint #3083557

[26] *Id.*, Complaint #3011125 (emphasis added).

[27] *Id.*, Complaint #2838864 (emphasis added).

faster delivery. This expectation is reasonable and supported by the plain and unambiguous "direct to you" language displayed on the checkout screen when customers pay the priority fee. This expectation is further confirmed by many of the specific statements made by consumers themselves in the various customer complaints discussed herein.

50.     In short, customers have every reason to believe that when they select direct delivery they are paying for the certainty that the driver will make *no* additional stops. If customers knew that the priority fee did not in fact guarantee that their delivery would arrive direct from the restaurant to their address, they would not pay it.

**IV.    Uber Intentionally Misrepresents the "Direct to You" Delivery to Enrich Itself at Consumers' Expense.**

51.     Uber understands how its own algorithms and delivery sequencing operate.

52.     Uber is also aware that its actual practices with respect to the priority fee subvert customers' reasonable expectations given the substantial number of customer complaints relating to this very issue.

53.     Nevertheless, Uber continues to mislead its customers because, in aggregate, priority fees contribute substantial amounts to its profit margins, and consumers would not pay them if they knew the truth.

54.     Uber does not publicly disclose how many U.S. orders it processes annually. However, extrapolating from broader industry data suggests that this number is in the hundreds of millions.

55.     For instance, in 2023 alone, Uber Eats' direct competitor, Grubhub, processed 248 million orders.[28] Uber Eats commands a substantially larger share of the U.S. market than Grubhub—26.1% compared to Grubhub's 6.3% as of 2024—so Uber Eats would have processed approximately 1 billion orders in that same period.[29]

56.     The direct delivery priority fee ranges from $1-5 per order, meaning that if only 10% of deliveries were priority deliveries in the middle of that fee range, the fees would collectively total

---

[28] https://www.businessofapps.com/data/grubhub-statistics/

[29] https://www.consumeredge.com/resources/all-posts/doordash-leads-us-delivery-share-but-some-cities-still-competitive/

in the hundreds of millions *each year*.

57.     The actual amount is likely far higher. One survey of 1,021 U.S. food delivery platform users found that about 41% of respondents reported choosing the "priority" option when ordering. *See* https://greensheet.com/breakingnews&article_id=2877.

58.     Accordingly, Uber benefits substantially from its false guarantee that priority orders will arrive "direct to" customers even though it knows that it cannot and does not reliably deliver on this promise.

**PLAINTIFF WRIGHT'S EXPERIENCE**

59.     On November 8, 2025, Plaintiff Wright paid an extra $1.49 for priority delivery on his Uber Eats order. When choosing priority delivery, Plaintiff Wright relied on the "direct to you" language at checkout, which he understood to mean that his Uber Eats driver would pick up his food and then deliver it to him directly (*i.e.*, not make other stops before delivering his food). Despite paying extra for priority delivery, Plaintiff Wright noticed that his order was taking a long time to arrive and that the driver had gone entirely out of the way.

60.     Plaintiff Wright contacted the delivery driver to inquire about what was going on. The driver messaged him back saying, "delivering another order."

61.     The delivery of this other order meant that Plaintiff Wright waited additional time for his priority delivery order to arrive, and that it was not delivered directly to him.

62.     On November 9, 2025, Plaintiff Wright contacted Uber Eats customer service to request a refund for his priority delivery fee, explaining that because his order was not actually delivered "direct to" him, he did not receive the service he paid for.

63.     Uber Eats' customer service admitted to Plaintiff Wright that the order was not delivered directly but Uber would not offer him any compensation or refund.

64.     Plaintiff Wright has not paid for priority delivery on Uber Eats since this incident, as he no longer trusts the representations that his order will be delivered "direct to" him.

65.     Plaintiff Wright would like to be able to pay extra to have his food delivered directly to him on occasion, if he could trust Uber's representation to that effect. He would order priority delivery again if Uber could actually guarantee that the food would be delivered directly to him

without additional stops, or pay a reasonable fee for an alternate priority service that was accurately described.

## CALIFORNIA LAW APPLIES TO THE NATIONWIDE CLASS

66.     California's substantive laws apply to every class member, regardless of where in the United States the class member resides.

67.     California's substantive laws may be constitutionally applied to the claims of Plaintiff Wright and the class members under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, and a significant aggregation of contacts, with the claims asserted by Plaintiff Wright and all class members, creating state interests such that the choice of California state law is not arbitrary or unfair.

68.     Uber's United States headquarters and principal place of business are in California. Many of Uber's key executives and thousands of its employees are located in California. On information and belief, Uber also owns property and conducts substantial business in California. Therefore, the State of California has a significant interest in regulating Uber's conduct under its laws. Uber's decision to reside in California, avail itself of its laws, and to engage in the challenged conduct, which originates from and emanates out of California, renders the application of California law to the claims alleged here constitutionally permissible. Upon information and belief, California is the state from which Uber's alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiff Wright and all other class members.

69.     The application of California laws to the Classes is also appropriate under California's choice of law rules. California has significant contacts with the claims of Plaintiff Wright and the proposed Classes because, inter alia, Plaintiff Wright is a California resident, and California has a greater interest in applying its laws here than any other interested state.

## PLAINTIFF WRIGHT'S AND CLASS MEMBERS' CLAIMS ARE NOT ARBITRABLE

70.     Uber apparently believes it can escape accountability for this pervasive false advertising by forcing its customers to accept convoluted dispute resolution procedures that are transparently designed to deter and extinguish claims. But Uber's adhesive dispute resolution procedures are unconscionable and therefore unenforceable.

71.    Uber's so-called "arbitration" clause in Uber's US Terms of Use ("Terms"), last updated June 9, 2026, is "unworthy even of the name of arbitration." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 688–90 (9th Cir. 2024). The process it imposes has nothing in common with the form of "[a]rbitration, as understood by Congress when it enacted the FAA," which "was designed to be a fair and efficient alternative to bilateral judicial proceedings." *Id*. at 690; *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 657–58 (2022) (discussing "the norm of bilateral arbitration as [the Supreme Court's] precedents conceive of it").

72.    Uber's dispute resolution process is not "bilateral," "individualized," or "informal." *Id*. at 656–57. Nor is it designed to be fair or efficient.

73.    In fact, a careful review of the "arbitration agreement" shows that there is no agreement "to settle by arbitration a controversy" at all, which is yet another reason the FAA does not apply. *See* 9 U.S.C. § 2.

74.    Rather, what the Terms actually require is a lengthy and onerous pre-dispute resolution process that claimants must follow as a "condition precedent" to asserting claims against Uber. But then the Terms provide that after forcing claimants through these various pre-dispute procedural hurdles, Uber can invoke a "Dispute Process" that, if successful, allows Uber to simply opt-out of arbitration and force claimants to start a new action in court.

75.    Besides undermining the entire concept that there is any "agreement" to resolve disputes in arbitration, Uber's unconscionable process operates to delay filing or processing arbitration demands while running out applicable statutes of limitation.

**I.    Consumers Are Surprised and Oppressed by Uber's Unconscionable and Unenforceable Dispute Resolution Provisions.**

76.    Consumers are both surprised and oppressed by Uber's adhesive dispute resolution terms. Uber's Terms contain no opt-out provision and are imposed on consumers in a procedurally unconscionable contract of adhesion.

77.    No consumer would expect or understand the Terms' conflicting array of provisions concerning individualized arbitration and mass actions, or the surreptitious ways they work together to delay and impede claims—including by rendering claims time-barred while claimants try to

navigate the Terms' labyrinthine dispute resolution processes, as detailed below.

## II.    Uber's Notice Requirements and Pre-Dispute Resolution Procedure Are Unconscionable and Unenforceable.

78.    According to Uber's Terms, before a consumers can assert any claim against Uber, they must follow an onerous "Pre-Arbitration Dispute Resolution and Notification" process.

79.    The Terms require that before a consumer can bring claims in arbitration, the individual must comply with detailed notification procedures requiring consumers (but not Uber) to submit a notice of claim in hard copy (Uber can send notice of claims via email), and then "personally meet and confer, via telephone or video conference" with Uber. Terms § 2(d).

80.    The meeting must be one-on-one: "Multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference." *Id*.

81.    Consumers are required to "appear at and fully participate in the conference," even if they are represented by counsel. *Id*.

82.    This requirement infringes on a consumer's right to be represented by counsel and to rely on their counsel's expertise and skill. And the vague requirement for individuals to "fully participate" in the conference (in addition to, and distinct from, merely appearing) is also void for violating legal ethical rules.

83.    At these conferences, Uber's counsel—either directly, or by coaching Uber's agents, indirectly—are impermissibly allowed to communicate with a represented party. More than that, the rules seem to *require* Uber's counsel to do so: to "fully participate" in the conference, consumers must speak directly with Uber's attorneys' or else Uber's representatives (whose statements and guidance will obviously be directed by Uber's counsel).

84.    Cal. Prof. Rule 4.2(a) states that "a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."

85.    This prohibition is read broadly. It prohibits any communication to Claimants when "the content of the communication to be had with the opposing party originates with or is directed by the attorney[.]" *San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 153 Cal.

Rptr. 3d 583, 602 (Cal. App. 2013) (quoting Cal. St. Bar. Comm. Prof. Resp., CA Eth. Op. 1993-131). Uber's counsel is also prohibited from, *inter alia*, "scripting the questions to be asked or statements to be made in the communications or otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney." *Id.*

86. On information and belief, Uber's attorneys advised it to create this informal dispute resolution process, and has advised, or will advise, Uber's representatives on the "questions to be asked or statements to be made" at such a conference.

87. Thus, the dispute resolution process violates the ethical rules described above. *See San Francisco Unified Sch. Dist.*, 153 Cal. Rptr. 3d at 602.

88. Consumers and their counsel, including Plaintiff Wright and the Classes at issue here, have not consented to these requirements, and forcing consumers to agree to them in adhesive Terms is not permitted (as Uber has argued) simply because a court has the power to order a party to appear personally at a mediation.

89. Nor is the pre-dispute conference requirement saved because the Terms provide that a "party's counsel may participate in the conference." Terms § 2(d). It is not a claimant's counsel's obligation to attend the conference to keep Uber's counsel from violating ethical rules; it is Uber's obligation not to create this situation in the first place.

90. Consumers' failure to provide sufficient notice of claims, or to attend and "fully participate" in the required pre-dispute personal meeting, subjects any arbitration demand they may later file to immediate dismissal: "Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing arbitration, and the Arbitrator shall dismiss any arbitration demand filed before completion of an informal dispute resolution conference." Terms § 2(d).

91. Once a pre-dispute meeting has occurred, a consumer may finally initiate arbitration. However, the consumer must comply with additional one-sided notice requirements, including both mailing or serving a hard copy of the demand on Uber and emailing an "as-filed" copy of the arbitration demand to Uber, and emailing a copy of the arbitration demand to the applicable arbitration provider. Terms § 2(d). Uber, by contrast, is only required to "send the written demand

for arbitration to you via electronic email." Failure by a consumer to abide by these notice requirements can also result in dismissal of the consumer's claims.

92.     Thus, Uber can further delay the resolution of the merits in arbitration by arguing that its vague and onerous Pre-Dispute Resolution procedures have been met. For instance, Uber can argue that a consumer did not "*fully* participate" in an informal dispute conference because it refused to answer certain questions or deferred to its counsel to respond to Uber's questioning. It is also implied but not directly stated that consumers should personally sign the demand for arbitration, opening the door for Uber to challenge any arbitration demand that is not personally signed by a consumer, in addition to being delivered to Uber in hard copy.[30]

## III.     Uber's Unconscionable Tolling and Statute of Limitations Provisions.

93.     Notably, while the Terms provide that the "statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by this paragraph," *i.e.* the personal pre-dispute "meet and confer" with Uber described in Terms § 2(d), the Terms provide for no other tolling.

94.     In fact, buried in a provision titled "Rules and Governing Law" the Terms state: "All statutes of limitations that would otherwise be applicable will apply to any arbitration proceeding." Terms § 2(c).

95.     So, if a party commences an arbitration and Uber asserts that the claimant did not "fully participate" in the required personal meet and confer, the parties argue the point and the arbitrator ultimately dismisses the claim for having not satisfied this "condition precedent" to arbitration, Terms § 2(d), the statute of limitations runs throughout this process.

96.     This is only one example of the multiple opportunities the Terms afford Uber to delay the processing or filing of arbitration claims while running out the statute of limitations to extinguish claims. The Terms' Mass Action protocol, discussed below, is another.

## IV.     Uber's Mass Action Protocol is an Elaborate Bait-and-Switch.

97.     If a consumer successfully navigates the various procedural hurdles above, she next

---

[30] *See* Terms § 2(d) (describing how to commence an arbitration by requiring hard copy documents without discussing signatures, but then adding in the following paragraph: "By signing the demand for arbitration, you agree ….")

must contend with Uber's "Mass Action" protocols.

98. This protocol imposes a convoluted process that indefinitely delays any arbitration on the merits, all without the benefit of tolling. And at the end, the consumer may find that Uber has changed its mind about arbitration, and can now force the consumer to start anew by pursuing her claims in court—if she still can.

99. The Terms never clearly explain this, but a careful reading makes this conclusion undeniable. It also makes clear that there is no "agreement" to resolve claims in arbitration. There is only a protracted process through which Uber may delay and impede claims, and then in the end opt-out of arbitration and demand that a consumer file a new proceeding in court.

100. First, the Terms provide that disputes "shall be resolved only in individual arbitration." Terms § 2(a)(2). Consumers "expressly waive the right" to have their claims against Uber heard "as a mass action, and neither an arbitrator nor an arbitration provider" has the authority "to administer any mass action or to award relief to anyone but the individual in arbitration . . ." *Id*. (the "Mass Arbitration Waiver").

101. Thus, the Terms clearly disallow "mass actions," but the Terms' definition of mass action is so open-ended that almost anything can be argued to be a mass action. And consumers can neither predict nor control whether their claims will be part of a mass action and therefore suddenly become non-arbitrable. This vitiates any purported agreement to arbitrate—parties cannot agree to arbitrate in a shifting and undefined set of circumstances.

102. According to the Terms, "the definition of a "Mass Action" includes, *but is not limited to*, instances in which you or Uber are represented by a law firm or collection of law firms that has filed 50 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Uber's behalf." Terms § 2(a)(3)(a) (emphasis added). Existing claims can therefore retroactively, and through no fault of their own, be sucked into an impermissible mass action if similar claims are filed by other claimants within 180 days. Terms § 2(a)(3)(a); *see also* Terms § 2(a)(3)(c)(ii) (providing that mass arbitration procedures would apply to "further proceedings" for claims "originally processed as individual arbitration demands").

Case No. 3:26-cv-7753                    19                    **CLASS ACTION COMPLAINT**

103. A "collection of law firms" that has filed "50 or more arbitration demands of a substantially similar nature" could mean 50 different consumers with 50 different counsel that all filed consumer protection claims against Uber. The language, "includes, but is not limited to," renders the definition even more vague and ambiguous—for instance, perhaps claims do not need to be "substantially similar" but only "somewhat similar." Or perhaps filing just twenty claims in a six-month period is sufficient, rather than fifty.

104. Uber can delay resolution of claims by making any of these arguments. And unlike consumers, who the Terms provide are subject to Rule 11 standards, the Terms impose no comparable requirement on Uber.

105. At a minimum, the mass action waiver appears to be triggered anytime multiple consumers are represented by the same counsel or multiple consumers file similar claims. Given the volume and frequency of Uber's misstatements about its priority "direct to you" service, multiple similar claims are highly likely. Likewise, counsel with expertise in these areas is highly likely to represent other claimants.

106. Besides its failure to clearly specify in which conditions claims will proceed in arbitration, this provision is problematic because a consumer has no control over whether other consumers have filed similar claims or engaged the same counsel. So consumers are barred from proceeding in a mass arbitration, but also have no power to avoid a mass arbitration—the mass arbitration either exists or does not exist based on nebulous factors that are largely outside the claimant's control.

107. And, as noted above, the open-ended definition of a "Mass Action" means that Uber can more freely dispute whether a claim violates the Mass Action Waiver, triggering a protracted review process.

108. The Terms provide that *whenever* an arbitration claim is filed, Uber can trigger a process misleadingly named "Dispute Procedure."[31] Terms § 2(a)(3)(b). The Dispute Procedure

---

[31] The language of this clause is vague, providing that "the arbitrator shall be empowered to determine whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver," and that "[e]ither party shall raise with the arbitrator or arbitration provider such a dispute within 15 days of its arising." Terms § 2(a)(3)(b). A "dispute" in this context is not defined.

involves a full review by an arbitrator (or panel of arbitrators). *Id*. This review has no set deadlines, rules, processes or procedures, but it will not conclude until the arbitrator(s) "issue a written decision with findings of fact and conclusions of law" concerning a single question: whether the claim at issue was filed as part of a Mass Action in breach of the Mass Action Waiver. *Id*.

109. Until this written decision is issued, an arbitration on the merits may not proceed and Uber may not be assessed any arbitration related costs or fees. *Id*.

110. Worse, at the end of all this, "[i]f the arbitrator or panel of arbitrators determines that any party has violated the Mass Action Waiver, the parties shall each have the opportunity to opt out of arbitration within 30 days of the arbitrator's or panel of arbitrator's decision." Terms § 2(a)(3)(b).

111. So a consumer does not know whether her claim is (or will become) part of a mass arbitration under the Terms' vague and open-ended definition. And even if a consumer could make an advance determination about whether her claim was part of a mass action, she has virtually no ability to avoid this result because she has no way to prevent other consumers from bringing similar claims.

112. Regardless, if the arbitration panel in the Dispute Procedure determines that her claim violates the Mass Action Waiver, Uber has the right to kick the claim out of arbitration and force the consumer to start anew in court.

113. Of course, since the Terms do not provide for tolling during the "Dispute Procedure," Uber can take advantage of the time wasted to argue that claims are now time-barred.

114. Thus, after forcing its users through multiple hurdles to even file an arbitration and have their claim processed, Uber can unilaterally stop any arbitration from proceeding by arguing that other consumers have filed substantially similar claims.

115. This is not a "written provision . . . to settle by arbitration a controversy," under the

---

Arguably, it would require a disagreement between the parties, but disagreement would be easy for Uber to manufacture simply by taking a position contrary to the consumer. Regardless, whether the issue can be raised unilaterally or requires some "dispute," Uber would have the ability to trigger the misleadingly named "Dispute Process," where in an arbitrator or panel of arbitrators renders "a written decision with findings of fact and conclusions of law" to decide whether the Mass Action Waiver has, in fact, been breached. *Id*. As explained, Uber has strong incentives to do so.

FAA, *see* 9 U.S.C. § 2. Consumers do not, and cannot, know in advance whether their claims will proceed in arbitration or be kicked out for violating the mass arbitration waiver, and it is unconscionable to force them to participate in this process when Uber may later opt-out of arbitration and force consumers to pursue claims in court.

116.    In short, Uber can (i) contest any individual consumer's status as part of a Mass Action, (ii) benefit from the delay inherent in the protracted and open-ended Dispute Process, (iii) benefit from the stay of any further proceedings and a relief from its obligation to pay costs and fees, and (iv) once the Dispute Process concludes, simply opt-out of arbitration all together.

117.    Further, if Uber's position is that it should be allowed to decide that it wants to exclude mass arbitration claims from arbitration while requiring other claims to be resolved there, it could simply require consumers who believe they may be part of a mass arbitration to notify Uber and provide for an opt out without the lengthy and unnecessary "Dispute Process."

118.    The fact that Uber chose to impose this process is compelling evidence that its goal is to impose these so-called arbitration procedures as an inferior forum and a means to extinguish valid claims, and not to efficiently resolve disputes.

119.    Finally, the opt-out provision is particularly unconscionable when the effect of forcing a consumer into court is properly considered. The Terms only contain a single tolling provision that operates to toll any "statute of limitations and any filing fee deadlines" during the pendency of the Pre-Arbitration Dispute Resolution and Notification process described below. But there is no provision for tolling the statute of limitations during the Dispute Process described above.

120.    By the time Uber can opt-out of arbitration and force a consumer to sue in court, the applicable statute of limitations on the consumer's claims may have already run. In that case, Uber would have leveraged the Terms to extinguish the consumer's right to any remedy in court.

121.    For the same reason, the consumer's ability to "opt-out" of arbitration after investing substantial time and effort to reach this point is largely illusory because the claim may be time-barred if the consumer opts out and initiates court proceedings. And even if some consumers could still successfully pursue claims in court, it is unconscionable for Uber to force them to spend months or years trying to resolve claims in informal dispute calls and pointless arbitration proceedings first.

**V.    The Mass Action Process Indefinitely Delays the Resolution of Claims a Consumer Tries to Arbitrate, Even If Uber Does Not Opt-Out of the Arbitration.**

122.    If a consumer feels forced to, and Uber agrees to, participate in the Mass Action grouping process it created, Uber can ask to appoint a Special Master "to resolve threshold disputes regarding the arbitration demands submitted in the Mass Action ("Mass Arbitration Demands")." Terms § 2(a)(3)(c)(i).

123.    As with the definition of "Mass Action" itself, the definition of "threshold disputes" is open-ended and vague.

124.    As with the Dispute Process, there are no rules, procedures, or processes to guide the Special Master in the exercise of their authority. However, unlike in the Dispute Process where an arbitrator (or panel) consider(s) a single issue arising out of a single claim, a Special Master (*i.e.*, one person) must resolve issues raised by hundreds or perhaps thousands of consumers.

125.    While no process, procedure or deadlines constrain the Special Master—or provide any guidance for their exercise of authority—there is a key limitation on the Special Master's power: they cannot decide issues for multiple claimants at once. The Special Master has no authority to address threshold issues on a collective basis because the Special Master has "no authority to consolidate cases." Terms § 2(a)(3)(c)(i)(7). Having one arbitrator individually decide so many issues will obviously delay resolution of claims.

126.    As soon as a Special Master is appointed and so long as they preside over a Mass Action, the applicable arbitration provider may not process "any of the Mass Arbitration Demands to which a dispute has been raised."[32] Terms § 2(a)(3)(c) (i)(7). In addition, "[n]o further payment for filing fees, administrative costs, or arbitrator fees shall be deemed due with respect to any of the Mass Arbitration Demands as to which a dispute has been raised until after the dispute(s) has/have

---

[32] The phrase "to which a dispute has been raised" is not defined but, presumably, refers to the process described in Section 2(a)(3)(b), where a "dispute" as to whether a claim was filed in a Mass Action triggers the Dispute Procedure discussed above. This implies that the appointment of a Special Master could prevent the applicable arbitration provider from processing *any* claim because Uber could easily manufacture a "dispute" as to any claim and trigger the Dispute Procedure. Note that Uber could do so even if, on its face, the claim had nothing to do with the pending Mass Action and could in no way be considered a part of the Mass Action. That is because the only apparent standard for triggering the Dispute Procedure is the existence of a "dispute" between the parties, or else, the Terms allow for any party to *sua sponte* trigger the Dispute Procedure.

been resolved by the Special Master." *Id*. The exception to this carve out are "fees and costs related to the proceedings before the Special Master" themselves. *Id*.

127.    Although consumers are barred from filing new claims while a Special Master is appointed, there is no complementary provision tolling the statute of limitations. This means that if a consumer cannot file before a Special Master is appointed and the Special Master does not resolve all issues before the statute of limitations runs, then the consumer's claim is extinguished.

128.    Appointing a Special Master denies consumers access to a forum and, in effect, may drastically shorten the limitations period. Claims could easily be timebarred before the Special Master is even part-way through with the onerous task resolving threshold issues one-by-one.

129.    Finally, if the Special Master completes this task, consumers and their counsel have just 14 days (not business days) to organize consumers into groups of 100. Each group of consumers is assigned "to a single arbitrator, with each group having one set of administrative documents, one set of administrative and filing fees per group, and one arbitration management conference per group." Terms § 2(a)(3)(c)(ii). Supposedly, these arbitrators have no authority to decide any issues collectively. "Regardless of the grouping described above, the arbitrator shall resolve all arbitrations within a group on an individual basis." *Id*. But there is no process to enforce this requirement. No rules, protocols or procedures contained in the Terms guide the arbitrator who presides over the batched groups. This lack of guidance is problematic in itself; the application of legal conclusions and rulings from previously decided arbitrations may operate to provide Uber "many of the protections and advantages of a class action, but provide to [consumers] virtually none of its protections and advantages." *See Heckman*, 120 F.4th at 685.

130.    Even at this stage, after having several opportunities to dispute whether consumers properly followed the notice procedures proscribed by the Terms, Uber can *still* "object that the filing or presentation of multiple arbitration demands" violates the terms. Terms § 2(a)(3)(c)(ii).

131.    The near intractable delay imposed by the Mass Action protocols will not only apply to claims that were filed as part of a Mass Action. Any qualifying demands that "were originally processed as individual arbitration demands before this batching procedure was commenced, further proceedings, including the assessment of further arbitration filing or administration fees to either

party shall be governed by the procedures" described above. Terms § 2(a)(3)(c)(iii).

## VI.    The Delegation Clause is Also Unenforceable.

132.    Uber purports to insulate this entire process from judicial review with yet more convoluted and contradictory language in the Terms so-called "Delegation Agreement," which "delegates" certain threshold issues that would otherwise be decided by a Court to an arbitrator. Terms § 2(a)(4).

133.    These conflicting provisions do not provide clear and unmistakable evidence of anything.

134.    The "Delegation Agreement" first grants an arbitrator "exclusive authority" to determine whether the arbitration process is unconscionable:

> Only an arbitrator, and not any federal, state, or local court or agency, shall have *exclusive* authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have *exclusive* authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. Terms § 2(a)(4) (emphasis added).

These portions are printed entirely in bold font.

135.    However, in the next line, the Terms provide that "only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes concerning the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable[.]" Terms § 2(a)(4). This text is printed in normal font, not the bold type of the text above.

136.    But two pages earlier in the Terms' "Dispute Procedure" section, Terms § 2(a)(3)(b) discussed above, the Terms also state that as part of that process: "the arbitrator shall be empowered to determine whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver." However, such a dispute would clearly be a "dispute concerning the Mass Action Waiver," so under Terms § 2(a)(4) it must be resolved by "a court of competent jurisdiction."

137.    This contradictory language does not amount to clear and unmistakable evidence of the parties' intent to delegate arbitrability issues. *See Tesla Advance Driver Assistance Sys.*, 2023 WL 6391477 at *6 (N.D. Cal. Sept. 30, 2023). Instead, there is an "inherent tension" in the contradictory delegations of authority to this Court and an arbitrator, the intended bounds of which are difficult to discern. *Id*.

138.    In addition, the delegation clause is unenforceable for many of the same reasons discussed above. It is imposed on consumers in an adhesive and oppressive manner, and a consumer must jump through multiple hoops before it can even start an arbitration where this issue might be resolved. Even then, a consumer has no way of knowing in which dispute resolution process the delegated issues will supposedly be resolved. Instead, a consumer may waste months or even years trying to get the issue resolved by an arbitrator only to find that Uber has invoked the Dispute Process and opted out of arbitration and the "delegated" issues must now be resolved by a court.

139.    For example, if several consumers argue that the Terms are unconscionable, Uber can invoke the Disputes Procedure, argue that the case has become a Mass Action in violation of the Mass Action Waiver because multiple consumers are advancing the same arguments, convince an arbitration panel to agree under the "including but not limited to" language in the definition of Mass Action, and then exercise its option to kick the claims out of arbitration and force claimants to start fresh in court. This is unconscionable.

**VII.    Other Unconscionable Provisions**

    **a.    The One-Sided Class Action Waiver.**

140.    The Terms contain a "Class Action Waiver," that purports to waive a consumer's right to have any claim "resolved[] or arbitrated as a class, collective, coordinated, consolidated, and/or representative action," and denies an arbitrator any authority to hear such an action or "to award relief to anyone but the individual in arbitration." Terms § 2(a)(2).

141.    Yet, "[n]otwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a class-wide, collective, and/or representative settlement of claims." Terms § 2(a)(2).

142.    So, Uber effectively bars claimants from using class action mechanisms to hold Uber

accountable, but it retains for itself the right to negotiate a class-wide resolution of a consumer's claims, without that individual's participation, and thus to insulate itself from liability for similar claims.

### b.  The Non-Mutual Exception to Mandatory Arbitration.

143.    The Terms allow claims for "injunctive or other equitable relief . . .  to prevent the actual or threatened infringement . . . of a party's . . . intellectual property rights" to be brought in court. Terms § 2(b). This provision allows Uber to avail itself of the judicial system to protect its intellectual property without being forced to go to arbitration.

144.    Although facially neutral, this provision is transparently one-sided because although Uber may have a claim against a consumer for a violation of intellectual property rights, consumers almost certainly will not have this type of claim against Uber.

### c.  Limitations of Liability.

145.    The Terms contain an extensive and expansive Disclaimer, Limitations of Liability and Indemnity clause that work to further insulate Uber from consumer claims.

146.    Uber disclaims any liability for consequential or indirect damages "even if Uber has been advised of the possibility of such damages." Terms § 8. Uber also disclaims any liability arising out of a consumers' "use of or reliance on the services or [consumers'] inability to access or use the services[.]" Terms § 8. Later, Uber reiterates that it "has no responsibility or liability to [consumers] related to any transportation . . . services provided to or not provided to" consumers by Uber's drivers. Terms § 8.

147.    Finally, the Terms include a one-sided indemnification provision, whereby consumers "agree to indemnify and hold Uber and its affiliates and their officers, directors, employees, and agents harmless from and against any and all actions, claims, demands, losses, liabilities, costs, damages, and expenses (including attorneys' fees), arising out of or in connection with" a consumer's use of the Uber service. Terms § 8.

### d.  Asymmetric Waiver Provision.

148.    Buried at the very bottom of the Terms, in a section titled "General," Uber includes an asymmetric waiver provision: "Uber's failure to enforce any right or provision in these Terms

shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing." Terms § 9. There is no similar protection for consumers under the Terms.

### e. Asymmetric Rule 11 Requirements.

149. The Terms also contain a long paragraph informing consumers that: "By signing the demand for arbitration, you agree to" comply with various Rule 11 type requirements. Terms § 2(d). No similar Rule 11 obligations apply to Uber's defenses or any other arguments that may be raised by Uber in an arbitration proceeding.

### f. Privilege Waiver and Other Unconscionable Provisions for Litigation Funding.

150. Uber also seeks to impede claims by imposing unconscionable provisions concerning litigation funding. These provisions are hidden far from the other dispute resolution provisions, under the heading "5. Accessing the Services."[33]

151. After discussing several items that actually relate to accessing the services, Uber includes a provision titled "Preventing Conflicts of Interest."

152. The provision requires consumers to "disclose any relationship that you may form with third-party Litigation Funders (whether they have an interest in the law firm representing you, your claim directly, or a portfolio of claims that involves your claim), and to disclose to Uber the relevant Litigation Funding Agreements to which you are a party or which involve your Claim(s).

153. Uber's Terms also force users to preemptively waive privilege and relevance objections by agreeing "that the existence (or not) of any Litigation Funding Agreement is relevant, admissible, within the scope of discovery, and not privileged, and that you have a continuing duty to provide Uber a copy of any Litigation Funding Agreement."

154. Even worse, "[a]s a condition of agreeing to these Terms, you waive any attorney client privilege, work product privilege, common interest privilege or similar protection, and to waive any claim of confidentiality, with respect to documents that you or your counsel share with a Litigation Funder and which you or your counsel receive from a Litigation Funder and/or the Litigation Funder's counsel."

---

[33] It appears that this is supposed to be under section 6., entitled at the top of the terms, "6. User Conduct and Requirements; Communications; Avoiding Conflicts of Interest; and User Content." However, this section heading does not appear in the Terms' text below.

155. There is no conceivable legitimate reason for these provisions, which are obviously designed to deter consumers from seeking litigation funding and deter litigation funders from providing it. Uber wrote the Terms and chose the arbitration providers. If it was actually concerned about "Preventing Conflicts of Interest," as the Provision's title suggests, rather than deterring claims, it could have specified that an arbitrator will have no connections with litigation funders or chosen an arbitration provider that does not employ such arbitrators.

### g. Other Unconscionable Provisions Regarding Fees.

156. The Terms contain additional provisions that are unconscionable on their face or in their likely effect. For instance, the Terms mandate that for "disputes arising in California," claims will be processed by ADR Services in accordance with ADR's Arbitration Rules ("ADR Rules"). Terms § 2(c). Plaintiff Wright is a California resident and, moreover, he asserts that California law should govern the claims of all members of the putative class. Accordingly, the ADR Rules would govern his claims in arbitration and, likely, those of all putative class members. *See id*.

157. The ADR Rules include a "Mass Consumer Non-Employment Arbitration" fee provision that imposes an initial filing fee of $250 on the first claimant and follow-on fees of $295 "assess[ed] to Claimant and Respondent per claim[.]"[34] This imposition of fees on *consumers* stands in stark contrast to the ADR Rules concerning mass arbitrations initiated by employees. There, the Respondent is solely responsible for paying follow-on fees.[35]

158. Moreover, the Terms operate to allow Uber to refuse to pay filing fees without suffering any consequence. As noted above, Uber can also indefinitely stay its obligation to pay fees during the pendency of several ancillary processes (*e.g.*, the Dispute Process) that it can unilaterally trigger. These stays apply to the claim at issue and, in most cases, to other pending claims.

### CLASS ALLEGATIONS

159. Plaintiff Wright reasserts, realleges, and incorporates herein all allegations in the

---

[34] https://www.adrservices.com/rate-fee-schedule/
[35] *See id.* ("A $250 nonrefundable Initial Filing Fee is payable by the Claimant upon the filing of a qualifying mass [employment] arbitration claim. A $550 nonrefundable Administrative Fee will be assessed to the Respondent per claim, payable upon issuance of a commencement letter.")

Case No. 3:26-cv-7753                         29                    **CLASS ACTION COMPLAINT**

foregoing paragraphs as if fully set forth herein.

160.    Pursuant to Fed. R. Civ. P. 23, Plaintiff Wright brings this action on behalf of himself and the following Classes, initially defined as follows:

**Nationwide Class**: All persons in the United States who paid a priority fee for any order advertised as "direct to you" or "delivered directly to you."

**California Class**: All persons in California who paid a priority fee for any order advertised as "direct to you" or "delivered directly to you."

161.    Excluded from the Classes are: (1) Uber, any entity or division in which Uber has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff Wright reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

162.    The claims of all class members derive directly from a single course of conduct by Uber. Uber has engaged and continues to engage in uniform and standardized conduct toward the class members.

163.    Certification of Plaintiff Wright's claims is appropriate because Plaintiff Wright can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

164.    Accordingly, Plaintiff Wright brings this lawsuit as a class action on Plaintiff Wright's own behalf and on behalf of all other individuals similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements. Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), and/or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

165.    **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The members of the Class are so numerous that joinder is impractical. The Class consist of thousands if not millions of members, the precise number which is within the knowledge of Uber and can be ascertained only by resort to Uber's

records.

166. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)): Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

      a)     Whether Uber engaged in the conduct alleged in this Complaint;

      b)     Whether reasonable consumers would understand Uber Eats' "Direct to you" representation to mean that their food would be delivered directly to them following pick up;

      c)     Whether the "Direct to you" language was material to a reasonable consumer;

      d)     Whether Uber violated the applicable statutes alleged herein;

      e)     Whether Uber's conduct emanated from the State of California;

      f)     Whether Uber's arbitration agreement is void, invalid, and/or unenforceable;

      g)     Whether Plaintiff Wright and class members were injured and harmed by Uber's conduct;

      h)     Whether Plaintiff Wright and class members are entitled to damages due to Uber's conduct as alleged in this Complaint, and if so, in what amounts; and

      i)     Whether Plaintiff Wright and class members are entitled to declaratory relief.

167. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)): Plaintiff Wright's claims are typical of the claims of the members of the Class because Plaintiff Wright, like all members of the Class, paid the priority fee when Uber's app and website contained serious omissions and misrepresentations regarding its operation. Furthermore, like all members of the class, Plaintiff Wright sustained damages from Uber's wrongful conduct. Accordingly, Plaintiff Wright has no interests antagonistic to the interests of any other member of the Class.

168. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)): Plaintiff Wright is a representative who will fully and adequately assert and protect the interests of the Class and have retained counsel who is experienced in prosecuting complex class actions, arbitrations, and consumer litigation. Accordingly, Plaintiff Wright is an adequate representative and will fairly and

adequately protect the interests of the Class.

169. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)): A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Uber's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

170. **Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(2)): In the alternative, this action may properly be maintained as a class action, because Uber has acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Uber. For example, one court might enjoin Uber from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions. The conduct of Uber is generally applicable to the Class as a whole and Plaintiff Wright seeks, inter alia, equitable remedies with respect to the Class as a whole. As such, the systematic policies and practices of Uber make declaratory relief with respect to the Class as a whole appropriate.

## COUNT I

**Violations of California's Unfair Competition Law ("UCL")**
**Cal. Business & Professional Code §§17200 *et seq.***
**(By Plaintiff Wright, individually, and on behalf of All Classes)**

171. Plaintiff Wright incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

172. California Business & Professions Code, §§ 17200, *et seq.* prohibits unfair

competition and provides, in pertinent part, that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Uber's false and misleading claims regarding its priority fee violate all three prongs of the UCL because they are unlawful, unfair, and fraudulent.

173. First, Uber's representations and omissions regarding the priority fee are unlawful because they are misleading to reasonable consumers and violate California's Consumer Legal Remedies Act and California's False Advertising Law, as alleged herein.

174. Second, Uber's representations and omissions regarding the priority fee violate the "unfair" prong of the UCL because they are illegal, immoral, unscrupulous, and substantially injurious to consumers, and the harm to consumers greatly outweighs any benefits associated with Uber's actions.

175. Third, these representations and omissions violate the "fraudulent" prong of the UCL because they have deceived Plaintiff Wright and are highly likely to deceive reasonable members of the public.

176. Plaintiff Wright and the class members reasonably relied on Defendant's representations and omissions. The representations and omissions were material, because a reasonable consumer would consider the "directness" of a delivery to be an important factor in deciding whether to pay a premium for that delivery, and those facts were a substantial factor in Plaintiff's and class members' decisions to pay the priority fee for their deliveries from Uber.

177. As a direct and proximate result of Defendant's violations of the UCL, Plaintiff Wright and the class members have suffered injury in fact and have lost money. Plaintiff Wright and the class members all paid an unwarranted premium for their deliveries and/or were denied the benefit of their bargain. Absent Uber's misrepresentations and omissions, Plaintiff Wright and the class members would not have purchased priority delivery or would have paid substantially less for it.

178. As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Uber has been unjustly enriched at the expense of Plaintiff Wright and the class members. Specifically, Uber has been unjustly enriched by obtaining revenues and profits it would

not otherwise have obtained absent its false, misleading, and deceptive conduct.

179. Through its unfair acts and practices, Uber has improperly obtained money from Plaintiff Wright and the class members. As such, Plaintiff Wright requests that this Court cause Uber to restore this money to Plaintiff Wright and all class members, and to enjoin the company from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiff Wright, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

180. **Permanent public injunctive relief**. Plaintiff, acting as a private attorney general, also seeks public injunctive relief to protect the general public from Uber's conduct.

181. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff Wright seeks a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market its Uber Eats priority fee. Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiff Wright, class members, and the public, which cannot be achieved through available legal remedies.

182. Plaintiff Wright remains in the market for food delivery services, and would purchase Uber's food delivery services, including those marketed as "direct to you," if he could trust Uber's representations. Plaintiff Wright cannot do so because Uber continues to deceptively market the operation of its priority fees.

183. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Wright and the class members seek a court order enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

184. Plaintiff Wright brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiff Wright and the class members are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II

**Violations of California's False Advertising Law ("FAL")**
**Cal. Business & Professional Code §§ 17500 et seq.**
**(By Plaintiff Wright, individually, and on behalf of All Classes)**

185. Plaintiff Wright incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

186. The False Advertising Law, codified at Cal. Bus. & Prof. Code §§ 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]" The FAL prohibits not only advertising which is false but also advertising which, although true, is either actually misleading or has a capacity, likelihood, or tendency to deceive or confuse the public.

187. Defendant violated the FAL when it advertised and marketed priority orders as "direct to you" through unfair, deceptive, and misleading representations and omissions disseminated to the public, all of which communicated that paying more for a delivery would mean the order would arrive direct from the restaurant or business to the customer, with no stops in between. Many "priority" customers do not receive their orders direct from the restaurant or business, even after paying a premium.

188. Plaintiff Wright and the class members reasonably relied on Uber's representations and omissions. These representations and omissions were material because a reasonable consumer would consider the "directness" of a delivery to be an important factor in deciding whether to pay a premium for that delivery, and those facts were a substantial factor in Plaintiff Wright's and class members' decisions to pay the priority fee for their deliveries from Uber.

189. As a direct and proximate result of Uber's violations of the FAL, Plaintiff and the class members have all suffered injury in fact and have lost money. Plaintiff Wright and the class members paid an unwarranted premium for deliveries and/or were denied the benefit of their bargain.

190. Absent Uber's misrepresentations and omissions, Plaintiff and the class members would not have purchased these deliveries or would have paid substantially less for them.

191. Consequently, Plaintiff Wright requests that this court cause Uber to restore this money to Plaintiff Wright and all class members, and to enjoin Defendant from continuing to violate

the FAL as discussed herein and/or from violating the FAL in the future. Plaintiff Wright and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

192. **Permanent public injunctive relief**. Plaintiff Wright, acting as a private attorney general, also seeks public injunctive relief to protect the general public from Uber's conduct.

193. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff Wright seeks a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market its Uber Eats priority fee. Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiff Wright, class members, and the public, which cannot be achieved through available legal remedies.

194. Plaintiff Wright remains in the market for food delivery services, and would purchase Uber's food delivery services, including those marketed as "direct to you," if he could trust Uber's representations. Plaintiff Wright cannot do so because Uber continues to deceptively market the operation of its priority fees.

**COUNT III**

**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code. §§1750 et seq.**
**(By Plaintiff Wright, individually and on behalf of All Classes)**

195. Plaintiff Wright incorporates by reference all allegations in this Complaint and restates them as if fully set forth here.

196. Plaintiff Wright and the other class members are consumers within the meaning of Cal. Civ. Code § 1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

197. Uber is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§ 1761(b) and 1770. 200. Uber and its Uber Eats direct delivery option is a "good" or "service" within the meaning of Cal. Civ. Code. §§ 1761(a) and (b).

198. Uber has violated § 1770(a)(5) by representing that its direct delivery option had characteristics it did not have. Uber advertises its "priority" orders as arriving "direct to [the consumer]," but, as Uber knows, paying the priority fee does not in fact guarantee that the order arrives directly from the restaurant or business to the customer. Therefore, despite being advertised as such, Uber cannot guarantee priority orders are, in fact, "direct."

199. Uber has violated § 1770(a)(7) by misrepresenting that its direct delivery option is of a particular standard, quality, or grade. Uber markets its "priority" fee as causing orders to arrive "direct" to the customer. However, in many instances, priority orders do not arrive direct to the customer, with couriers making one or more intervening stops. In fact, priority orders may make as many or *more* stops as standard orders. Thus, the priority orders are not of the premium standard, quality, or grade of which they are advertised.

200. Uber has violated § 1770(a)(9) by advertising its Uber Eats direct delivery option with an intent not to provide such delivery as advertised. Uber advertises its "priority" fee as guaranteeing that an order will arrive "direct to [the consumer]." But Uber knows this is not the case. Not only can Uber not guarantee direct delivery, it actively prevents that from happening in the case of batch or add-on orders, and Uber does not even alert its drivers which orders are priority. Accordingly, in many instances, priority orders do not arrive direct to the customer, with couriers making one or more intervening stops. In fact, priority orders may make as many or *more* stops as standard orders. Therefore, despite being advertised as such, these "direct to [the consumer]" orders come with no such assurances.

201. Plaintiff Wright and the other class members suffered actual damages as a direct and proximate result of Uber's violation of the CLRA for conduct alleged herein.

202. Plaintiff Wright seeks relief for violations of the CLRA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff Wright and the class members. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages.

203. Plaintiff Wright and the class members therefore demand judgment against Uber for restitution, injunctive relief, and attorney's fees and costs.

204. **Permanent public injunctive relief**. Plaintiff Wright, acting as private attorney generals, also seeks public injunctive relief to protect the general public from Uber's conduct.

205. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff Wright seeks a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market its priority fee as guaranteeing orders will arrive "direct to [consumers]." Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiff Wright, class members, and the public, which cannot be achieved through available legal remedies.

206. Plaintiff Wright remains in the market for food delivery services, and would purchase Uber's food delivery services, including those marketed as "direct to you," if he could trust Uber's representations. Plaintiff Wright cannot do so because Uber continues to deceptively market the operation of its priority fees.

**COUNT IV**

**Fraud**
**(By Plaintiff Wright, individually, and on behalf of All Classes)**

207. Plaintiff Wright incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

208. Uber, through its app and website, represents to consumers that paying the Uber Eats priority fee will cause orders to arrive "direct to [the consumer]."

209. In fact, however, paying the priority fee does not guarantee that an order will arrive "direct to [the consumer]" because Uber allows its drivers to pick up additional orders after picking up Uber Eats priority orders, it authorizes its couriers to "multi-app," meaning they may pick up and/or deliver orders from other platforms after picking up an Uber Eats priority order, and it doesn't even notify its drivers that orders are priority/direct delivery.

210. Uber thus cannot control or guarantee whether a given priority delivery will be "direct to [the consumer]," despite representing to customers that it will be.

211. Uber makes the foregoing representations and omissions intending to deceive Plaintiff Wright and class members into purchasing priority deliveries advertised as "direct to you."

212.    When Uber advertises priority deliveries as "direct to you," it knows those representations are false and misleading.

213.    These representations and omissions are material because a reasonable consumer would consider the lack of intervening stops to be an important factor in deciding whether to pay a premium for "direct" delivery, and those facts were a substantial factor in Plaintiff Wright's and class members' decisions to pay the priority fee for their deliveries from Uber Eats.

214.    Uber's fraudulent misrepresentations and omissions directly and proximately caused injury in fact and actual damage to Plaintiff Wright and class members. Absent these misrepresentations, Plaintiff Wright and the class members would not have elected and paid for the priority fee option or would have paid substantially less for such delivery.

215.    Plaintiff Wright seeks actual, compensatory, and punitive damages in an amount to be proved at trial on behalf of themselves and class members.

**PRAYER FOR RELIEF**

216.    WHEREFORE, Plaintiff Wright, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiff Wright, the Class and all Sub-Classes, and award the following relief:

    A.    An order certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff Wright as representative of the Classes, and designating Plaintiff Wright's counsel as Class Counsel;

    B.    An award to Plaintiff Wright and the Consumer Classes of compensatory damages and actual damages to be determined by proof;

    C.    An award to Plaintiff Wright and the Consumer Classes of restitution;

    D.    An award to Plaintiff Wright and the Consumer Classes of punitive damages;

    E.    An injunction on behalf of Plaintiff Wright and the Classes, as well as on behalf of the public;

    F.    An order awarding declaratory and equitable relief, including a declaration that Uber violated and has continued to violate California's UCL, FAL, and CLRA, as well as the common law of fraud, and an injunction requiring Uber to comport with these state

statutes, and for restitution and disgorgement;

G.    An order awarding Plaintiff Wright and the Class reasonable attorneys' fees and costs, as allowable by law;

H.    An order awarding pre-judgment and post-judgment interest;

I.    An order declaring Uber's arbitration agreement void, invalid, and/or unenforceable; and

J.    Any such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

217.    Plaintiff Wright demands a trial by jury for all claims so triable.

Dated: July 27, 2026                Respectfully Submitted,

**JANOVE PLLC**

*/s/  Raphael Janove*
Raphael Janove (Cal. Bar No. 361193)
raphael@janove.law
JANOVE PLLC
115 Broadway, 5th Fl.
New York, NY 10006
Telephone: (646) 347-3940

Liana Vitale (Cal. Bar No. 348772)
liana@janove.law
JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone:  (805) 505-9550

Elizabeth Aniskevich (DC Bar No. 994603)
eaniskevich@singletonschreiber.com
(*pro hac vice* forthcoming)
Jennifer Yadoo (DC Bar No. 1780435)
jyadoo@singletonschreiber.com
(*pro hac vice* forthcoming)
Ryan Crosswell (NC Bar No. 36700)
rcrosswell@singletonschreiber.com
(pro hac vice forthcoming)
SINGLETON SCHREIBER, LLP

650 Massachusetts Ave. NW, Suite 600
Washington, DC 20001
Telephone: (619) 771-3473


Anna Haac (DC Bar No. 979449)
anna@haaclaw.com
(*pro hac vice* forthcoming)
HAAC LAW, LLC
11810 Grand Park Ave., Ste. 500
North Bethesda, MD 20852
Telephone: (240) 389-0199

*Attorneys for Plaintiff and Proposed Classes*

Case No. 3:26-cv-7753                           41                  **CLASS ACTION COMPLAINT**

I, Hassan Wright, declare:

1. I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2. I submit this Declaration pursuant to California Code of Civil Procedure § 2015.5 and California Civil Code § 1780(d).

3. As set forth in my complaint, on November 8, 2025, I purchased priority delivery on Uber Eats.

4. Because Defendant is based in San Francisco, California, the Northern District of California is the proper place for the trial of this action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

07/24/26

*Hassan Wright*
Hassan Wright (Jul 24, 2026 15:06:57 PDT)

Date

Hassan Wright